IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ROBIN SHAW,

      Plaintiff,

v.                             CASE NO. 1:15-cv-74-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income (SSI.)  (ECF No. 1.)  The Commissioner has answered, and both parties have filed briefs outlining their respective positions.  (ECF Nos. 9, 16, 17.)  For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I.  PROCEDURAL HISTORY

      Plaintiff filed an application for SSI on March 5, 2012, alleging disability beginning July 1, 2003. (R. 188-93.)  Plaintiff's application was

denied initially and upon reconsideration.  (R. 129-34, 136-40.)  After a

hearing, Administrative Law Judge ("ALJ") Teresa Hart issued a written

decision on June 24, 2014 finding that Plaintiff was not disabled. (R. 11-23.)

Plaintiff requested review of the ALJ's decision by the Appeals Council,

which was denied on February 23, 2015.  (R. 1-4.)   This appeal followed.

(ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the

evidence must do more than merely create a suspicion of the existence of a

fact, and must include such relevant evidence as a reasonable person

would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

that the evidence preponderates against the Commissioner's decision.[3]

The district court must view the evidence as a whole, taking into account

evidence favorable as well as unfavorable to the decision.[4]  However, the

district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the

district court with sufficient reasoning to determine that the Commissioner

properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months.[6]

The impairment must be severe, making Plaintiff unable to do his previous

---

[3] *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] *Keeton v. Dep't Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

work, or any other substantial gainful activity which exists in the national

economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]

First, if a claimant is working at a substantial gainful activity, he is not

disabled.[9]  Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled.[10]  Third, if a claimant's impairments meet or

equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he

is disabled.[11]  Fourth, if a claimant's impairments do not prevent him from

doing past relevant work, he is not disabled.[12]  Fifth, if a claimant's

impairments (considering his residual functional capacity ("RFC"), age,

education, and past work) prevent him from doing other work that exists in

---

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her

---

[13] 20 C.F.R. § 404.1520(f).

[14] *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] *Doughty*, 245 F.3d at 1278 n.2. In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[17] *Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] *Walker*, 826 F.2d at 1003.

[19] *Wolfe*, 86 F.3d at 1077-78.

[20] *See id.*

## III.  SUMMARY OF THE RECORD

### A.    Medical History

As a child, Plaintiff exhibited both behavioral and educational difficulties in school.  In third grade, she was referred for an education evaluation because she was "having some problems learning the academic material and adjusting socially with her peers."  The examiner stated that Plaintiff had good concentration, effort, and motivation and that Plaintiff was eager to please, which caused her to give irrelevant answers to questions rather than admit that she did not know the correct answers.  The examiner suggested that Plaintiff did not have a learning disability but rather her behavior was related to an emotional component (the examiner referenced a report by a Dr. Pimm, which is absent from the record).  The examiner opined that with effort by parents and teachers, Plaintiff could maintain steady academic progress.   (R. 383-85.)

The examiner also referred to a report by Dr. Pimm, in which Dr. Pimm found that Plaintiff had a normal or average intelligence range. Although Plaintiff scored extremely low on the "auditory attention span for sentences" portion of the test, her other auditory subtests were within the average range. The examiner concluded that Plaintiff did not have a

learning disability.  The examiner also stated that Plaintiff was currently reading a half year above grade level, and concluded that Plaintiff had "good ability and should be encouraged to achieve her potential. "  (R. 383-85.)

During junior high and high school, Plaintiff was continually referred to the principal's office for being disruptive and talking during class.  Plaintiff was placed on academic probation due to poor academic performance in 1983.  On December 4, 1984, she was suspended from South Plantation High for ten days for allegedly threatening a student with scissors. Expulsion proceedings were commenced later.  (R. 300-12.)

In April 2011, Plaintiff entered an opioid treatment program at Meridian Behavioral Healthcare.  (R. 331- 67, 444-96.) Throughout her treatment, Plaintiff's drug screening results regularly were positive for methadone and positive for cocaine one time.  The records for this program mostly contain Plaintiff's urinalysis results and Plaintiff's compliance with her treatment plan.  Plaintiff was assessed by a physician at Meridian for withdrawal symptoms and a methodone increase.  (R. 368-69.)

Plaintiff was seen by a physician for medication management at Meridian during the treatment program.  The physician consistently

assessed Plaintiff as having a good appearance, appropriate manner, normal motor behavior, volume, and speech, normal productivity, grossly intact cognition, appropriate thought content and an unremarkable thought process.  (R. 370-75.)  The physician diagnosed Plaintiff with opioid dependence and major depressive disorder.  She was prescribed Lexapro and Trazodone.  *Id.*

Meridian conducted a treatment plan reassessment in April of 2012. The plan notes that Plaintiff was arrested for DUI in September of 2011, but since then she had been doing well with her substance abuse program and completed her requirements for the Drug and Alcohol Safety Council. Plaintiff planned to apply for a hardship driver's license and was completing community service hours.  The plan states that Plaintiff was living with her sister and family but was exploring options to continue her education and volunteer at animal shelters.  Plaintiff expressed interest in finding a job once her community service hours were completed.  She reported reduced symptoms of depression and an overall positive response to her medication. (R. 379.)

Meridian released additional treatment plan updates for Plaintiff in June of 2013 and in December of 2013.  Both plans noted that Plaintiff

reported doing well in opioid recovery and noted a decrease in her symptoms of depression.  (R. 547-50.)

On December 20, 2011, Dr. Pamela Vetro, Ph.D., performed a consultative psychological evaluation on Plaintiff.  Plaintiff reported to Dr. Vetro that she could not be around a lot of people and became nervous, hot, and uncomfortable.  Plaintiff reported anxiety and panic attacks.  She also reported that she had been diagnosed with many different psychological disorders, including depression, schizophrenia, bipolar disorder and substance abuse.  Plaintiff stated that she "get[s] all scrambled" and gets "distracted by intrusive thoughts" and talks to herself. (R. 387-410, 426-42.)

Plaintiff has three children—two were adopted at birth and one lived with Plaintiff's mother.  She reported that her only health concerns were her mental health and substance abuse issues.  Plaintiff's mother represented that Plaintiff had trouble socializing and had trouble in school.  Her mother reported that at age seventeen she was in drug rehab, where she was diagnosed with schizophrenia.  Plaintiff stated at the evaluation that she no longer drank alcohol.

Plaintiff told Dr. Vetro that she hears voices and has auditory

hallucinations. She also acknowledged grandiose delusions. Plaintiff related a drug abuse history starting at age fifteen, including crack cocaine, heroin, and Xanax use. She reported that methadone "saved [her]" and that she attends Narcotics Anonymous meetings once or twice a month.

Plaintiff described her behavioral difficulties in school, including reprimands for disrupting the class and her expulsion for the scissors incident. She also skipped school regularly. Plaintiff later obtained her GED at age 22.

Dr. Vetro referenced Plaintiff's third grade education evaluation but concluded that there was no evidence of a learning disability although Plaintiff had difficulty with social adjustment and peer relations. Dr. Vetro also noted Plaintiff's placement in juvenile detention at age fifteen for stealing bikes. Dr. Vetro also noted that Plaintiff had additional legal troubles in her twenties and thirties, including possession of crack cocaine and narcotics and attacking a friend.

Dr. Vetro found that Plaintiff was a hard worker, who displayed mild frustration, but worked within a normal speed and with normal fatigue. Dr. Vetro further found that Plaintiff had clear, coherent, and logical thoughts. She concluded that Plainitff had a high activity level and was easily

distracted.  Dr. Vetro described Plaintiff as lucid and oriented, polite and cooperative, and energetic and spirited.

Dr. Vetro administered the WAIS-IV and found that Plaintiff's IQ was 88, which was within the low average range of intellectual functioning. Plaintiff's ability to sustain attention, concentrate, and exert mental control was within the low average range.  Overall, Dr. Vetro concluded that Plaintiff's cognitive processing and achievement were in the low average to average range and that there was no evidence of a learning disability.  Dr. Vetro stated that Plaintiff needed drug abuse treatment and diagnosed Plaintiff with polysubstance dependence.  Dr. Vetro also diagnosed Plaintiff with schizophrenia and recommended follow up with Plaintiff's psychiatrist. Dr. Vetro opined that Plaintiff was not prevented from working by her cognitive abilities, but that she suffered major mental illness that would make employment difficult.

In August of 2012, Plaintiff saw Dr. Lance Chodosh, M.D., for a consultative examination.  Dr. Chodosh noted that Plaintiff had a full range of motion in all joints, a negative straight leg test, and no deformity, tenderness, or muscle spasm in her spine or back.  She could stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear and speak

normally. (R. 497-505.)

A state agency physician, Dr. Thomas Renny, D.O., reviewed Plaintiff's medical records in August 2012. He determined that Plaintiff did not have a severe physical impairment. A state agency psychologist, Dr. Pauline Hightower, Psy. D., reviewed Plaintiff's medical records in July 2012. She found that Plaintiff did have a severe mental impairment. She considered listings 12.03, 12.04, and 12.09 and found that Plaintiff did not meet any of these listings. Dr. Hightower found that Plaintiff could carry out both short and simple instructions and detailed instructions. Dr. Hightower determined that Plaintiff was only moderately limited in concentration and persistence, social interactions, and adaption. She concluded that Plaintiff could be expected to perform simple and repetitive tasks and meet the basic mental demands of work on a sustained basis. (R. 506-11, 511-17.)

State agency psychologist Jessy Sadovnik, Psy. D., reviewed Plaintiff's mental records in May 2012. Dr. Sadovnik found that Plaintiff had a severe mental impairment (affective disorder, schizophrenia and other psychotic disorders, and substance addiction disorders). Dr. Sadovnik determined that Plaintiff did not meet any listings and that Plaintiff was only moderately limited in concentration and persistence, social

interactions, and adaption.  Dr. Sadovnik opined that Plaintiff could perform simple and repetitive tasks and could meet the basic mental demands of work.  (R. 520-29.)

## B.    Hearing Testimony

Plaintiff attended a hearing before ALJ Teresa Hart on May 28, 2014 and testified regarding her prior work experience and her claim for disability. She was 42 years old at the time of the hearing.  In 1999, Plaintiff worked on her sister's ranch to help out her family.  Her duties included feeding and brushing the horses for which she was compensated with room and board. This was the last time Plaintiff worked, and she testified that the work was only for about an hour each day.

Plaintiff attended South Plantation High School in Fort Lauderdale but did not graduate. She obtained her GED about five years after she dropped out.  Plaintiff claimed that she did not pass the test to obtain her GED the first time she took it.  She had vocational training in nail care.  She previously had a driver's license, but lost it two years prior after a DUI conviction.

On a typical day, Plaintiff testified that she would spend time with her dog, and described herself as a loner.  She stated that she does not really

watch her niece and nephew because her sister believes that she cannot "watch them well," but she helps take care of them if her mother is present.

Plaintiff believes that she cannot work because she forgets things and has trouble focusing. According to Plaintiff, she needs a fifteen minute break after two hours of working. She also testified that she talks to herself a lot and frequently hears voices. At the time of the hearing, she was being treated at Meridian for substance abuse with methadone, and she was also being treated for manic depression and trouble sleeping.

A board certified psychiatrist, Dr. Robert John McDevitt, testified at Plaintiff's hearing. He reviewed her medical records and noted that Plaintiff had been treated with methadone since 2012 at Meridian. Dr. McDevitt testified that Plaintiff was taking Lexapro and a medication for sleep, Trazodone. Dr. McDevitt noted that Plaintiff had done well with this treatment program.

Dr. McDevitt testified that at Plaintiff's 2011 evaluation by Dr. Vetro, the objective tests "did not show very much." According to Dr. McDevitt, although Dr. Vetro found Plaintiff was quite engaging and showed good affect, Dr. Vetro made a diagnosis of schizophrenia based on Plaintiff's response to a personality assessment inventory. Dr. McDevitt said that

there was no evidence that Plaintiff had been treated for schizophrenia.

Dr. McDevitt noted that Plaintiff was on a relatively modest dose of methadone and had fulfilled the remaining criteria of the program.  He noted that Plaintiff could take care of things at home, and had not had much formal treatment.  Dr. McDevitt concluded from the records and the testimony that whether or not Plaintiff had schizophrenia was not clear from the medical records.  Dr. McDevitt took into account that Plaintiff had a long history of drug abuse, including heroin and cocaine, conditions which are known to cause affective disturbances. But, Dr. McDevitt found significant that there was no formal diagnosis of a mental disorder in the record.  Dr. McDevitt said that Plaintiff had a depressive order, which was helped by medication, according to the Meridian records.

According to Dr. McDevitt, Dr. Vetro's diagnosisof schizophrenia is suspect because there are no other medical sources confirming the diagnosis.  The Meridian records, while ambiguous, show, according to Dr. McDevitt, that Plaintiff is functioning fairly well. Further, Dr. McDevitt testified that in his opinion Plaintiff's interaction with doctors does not support schizophrenia because Plaintiff frequently is noted as having good affect and responding well.  Further, McDevitt found it significant that there

is no evidence that Plaintiff has any cognitive impairment, and that a person with schizophrenia "should have some cognitive problems, and one should have at least presence of some of the positive symptoms and negative symptoms."  In sum, based upon the evidence presented, Dr. McDevitt concluded that there was "no compelling evidence that she [Plaintiff] has a severe mood disorder or a schizophrenic disorder."

With respect to Listing 12.04, Dr. McDevitt testified that Plaintiff has good activities of daily living, moderate difficulties with social interaction, and reasonably good concentration, persistence, and pace.  He stated that she lives in a supportive arrangement with her family, which would meet C.2, but qualified it as a "longshot" and stated that the record available did not support a severe mental disorder.

Dr. McDevitt opined that Plaintiff might have a chronic mood disorder, which was controlled with medications and the absence of drug use.  He concluded that Plaintiff would have trouble working in a team.  He thought Plaintiff could do independent work and simple repetitive work and complex work, but that her public contact should be limited.

Upon examination by Plaintiff's representative, Dr. McDevitt testified that Plaintiff's score on Dr. Vetro's personality assessment test on the

schizophrenia scale did not have any correlation with the diagnostic criteria used for evaluating schizophrenia.  Dr. McDevitt opined that he did not think that a diagnosis of a major mental disorder could be made on a self-reporting scale.  Dr. Mcdevitt said that if he were evaluating Plaintiff for schizophrenia, he would require a more thorough history, including "easing out interaction of the drugs with her mood disorder" and requiring additional evaluation.  He said that regarding the possibility of schizophrenia, having a psychiatrist's notes would be helpful.

Dr. McDevitt concluded that he observed no evidence of concentration issues, based on Dr. Vetro's objective examination and Plaintiff's avid book reading.  He concluded that he did not think that standard testing objectively supported a schizophrenic or bipolar disorder, and that any evidence of schizophrenia would have manifested before age 25.  According to Dr. Mcdevitt, it was more likely that Plaintiff had a chronic mood disorder, but he was unsure whether this disorder was "de novo, original, or secondary to the extensive substance abuse." (R. 28-79.)

## C.    Findings of the ALJ

The ALJ found that Plaintiff had the severe impairments of affective disorder and polysubstance abuse.  The ALJ concluded that Plaintiff did

not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  The ALJ determined that Plaintiff's residual functional capacity ("RFC") was as follows:

"[A] full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple and repetitive tasks of unskilled work.  The claimant is further limited to work that does not involve team effort work tasks, and she can have no more than occasional interactions with co-workers and the public." The ALJ concluded that Plaintiff did not have any past relevant work. Relying upon the testimony of a vocational expert , the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy, including commercial cleaner, kitchen helper, and marker.  (R. 11-23.) The ALJ therefore concluded that Plaintiff was not disabled.

## IV. DISCUSSION

Plaintiff raises two main arguments on appeal. First, Plaintiff argues that the ALJ failed to develop the record by not ordering additional medical records and a consultative psychiatric examination after psychiatrist McDevitt testified regarding Dr. Vetro's evaluation. Secondly, Plaintiff

argues that the ALJ: (1) failed to credit the opinions of the state agency

psychologists that Plaintiff's limitations would impact her ability to work;

and (2) failed to discuss Dr. McDevvit's testimony that Plaintiff may meet

Listing 12.04 diagnostically and section C.2. The Court will discuss each

issue below.

## A.  The ALJ did not fail to fulfill her duty to develop the record.

It is well-settled that an ALJ has a basic obligation to fully and fairly

develop the record.[21]   As a hearing is non-adversarial in nature, the duty to

develop the record is triggered when there is ambiguous evidence or when

the record is inadequate to allow for proper evaluation of the evidence.[22]  In

all such cases, there must be a showing of prejudice before remand is

warranted for further development.[23]  Prejudice has been found when the

record "has evidentiary gaps which result in unfairness or 'clear

---

[21] *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981); *see also Zaldivar v. Apfel*, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[22]  *Mason v. Barnhart,* 63 F. App'x 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[23] *Brown v. Shalala*, 44 F. 3d 931, 935 (11th Cir. 1995)("In evaluating the necessity for a remand, we are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice."); *Kelley v. Heckler*, 761 F. 2d 1538, 1540 (11th Cir. 1985).

prejudice.'"[24]  An ALJ, however, is not required to order medical evidence to have a complete record unless the record establishes that it is necessary to enable the ALJ to render his decision.[25]

Plaintiff requested a mental evaluation by a psychiatrist for clarification on her mental state, based upon the report by Plaintiff's mother to Dr. Vetro that Plaintiff had been diagnosed as a schizophrenic when she was young and Dr. Vetro's diagnosis of schizophrenia.  The ALJ denied the request in her decision, concluding that the examination was "not necessary to resolve ambiguities in the record; nor was it necessary to develop the record further in order to reach a decision in this case."  Plaintiff says that this denial of her request for a consultative psychiatric examination is reversible error, as the record demonstrated a "lifetime of mental illness" and an "inability to function outside of a highly supportive family environment."

The ALJ discussed Plaintiff's allegations of schizophrenia and difficulty focusing at length in her written decision.  While the ALJ noted that

_____

[24] *Brown*, 44 F. 3d at 935 (quoting *Ware v. Schweiker*, 651 F. 2d 408 (5th Cir. Unit A July 1981)).

[25] *Holladay v. Bowen*, 848 F. 2d 1206 (11th Cir. 1988) (concerning the ordering of a consultative examination); *Kelly*, 761 F. 2d at 1540 (concerning additional medical information submitted by claimant).

Plaintiff had difficulties in school and was hospitalized at Fair Oaks Hospital in 1987 for physical and psychiatric testing, she pointed out that the record did not contain any notes from the hospital.  (R. 18.)  In concluding that a further consultative evaluation was not necessary the ALJ pointed to the fact that Dr. Pamela Vetro had conducted a psychological evaluation, including administering the Personality Assessment Inventory. The report disclosed that Plaintiff's personality profile was elevated for drug abuse, schizophrenia, and depression.  (R. 18-19.)  Further, while Dr. Vetro noted inconsistencies in Plaintiff's responses, demonstraring exaggeration, Dr. Vetro ultimately diagnosed Plaintiff with schizophrenia and polysubstance abuse.

The ALJ also relied upon Plaintiff's treatment records at Meridian, where Plaintiff maintained good standing in her treatment program and was exploring options for continuing education and volunteering at animal shelters.  According to the ALJ ,these records suggested that Plaintiff was less limited than presented by Dr. Vetro's report.  Furthermore, the ALJ found significant the fact that the Meridian records did not evidence that Plaintiff ever received mental health care for her symptoms, or that her symptoms were consistent with the level of severity that she had alleged.

Additionally, in concluding that there was no need for a further consultative examination, the ALJ noted that Plaintiff saw Dr. Chodosh for a consultative examination.  While Dr. Chodosh noted in his report Plaintiff's allegations of schizophrenia, Dr. Chodosh did not document any objective problems or unusual behavior. Rather, Dr. Chodosh found that Plaintiff was fully oriented with normal speech pattern, appropriate thought content, and anxious affect.  When Plaintiff's treatment plan was reassessed at Meridian, the physicians there found that she was doing better with medication, that her depression improved, and that she had shown a great deal of progress.

The only treatment in the record is for Plaintiff's drug abuse and depression.  Beyond Plaintiff's self report of mental health issues, the record does not contain any evidence documented that Plaintiff experienced symptoms such as hallucinations, paranoia, or a loss of concentration or of focus at the level of severity that Plaintiff claims.

Moreover, the ALJ had the benefit of testimony at the hearing from Dr. McDevitt, a board certified psychiatrist.  Dr. McDevitt testified that in his expert medical opinion that Dr. Vetro's evaluation was not well supported and that the diagnostic criteria for schizophrenia were different from the

personality assessment questions.  Dr. McDevitt concluded that there was

no objective basis in the record for a diagnosis of schizophrenia.

While the ALJ has a duty to develop the record when appropriate, the

ALJ is not required to order a consultative examination when the record, as

here, has sufficient evidence to make an informed decision.  *Doughty v.*

*Apfel*, 245 F.3d 1274, 1281 (11 th Cir. 2001).

Despite lacking an evaluation by a psychiatrist, the record was more

than sufficient for the ALJ to determine Plaintiff's mental residual functional

capacity.  Both State agency psychologists concluded that Plaintiff could

perform simple and repetitive tasks and meet the basic mental demands of

work on a sustained basis.  More notably, Dr. McDevitt, a licensed board

certified psychiatrist, testified at the hearing and concluded that Plaintiff

could perform independent work, simple repetitive work, and complex work

(with the limitations that she not work in a team and be limited from public

contact).  De. McDevitt testified that he saw no problem with Plaintiff's

ability to concentrate, given the objective reports of the examining

physicians and Plaintiff's avid reading.

None of the physicians, who examined Plaintiff at Meridian, nor Dr.

Chodosh, recommended that Plaintiff receive either an additional consultation or additional mental health treatment beyond her treatment for depression and drug abuse.  And importantly, Dr. McDevitt found that Plaintiff interacted appropriately with the physicians that examined her and that she lacked the symptoms that a schizophrenic would display. Accordingly, the record was sufficiently complete for the ALJ to determine Plaintiff's mental residual functional capacity. *See Good v. Astrue*, 240 F. App'x 399, 403 (11th Cir. 2007)(holding that the ALJ did not err by failing to order a consultative examination because the record was sufficiently developed and no other physician recommended an additional consultation)

Plaintiff says that it was error to rely upon the absence of mental health findings as a basis for denying another consultative examination to determine whether Plaintiff had schizophrenia.  Plaintiff says that although she provided invoices from Florida Medical Group in 1987, evidencing psychiatric treatment, the records were never requested and are not part of the record.  While this may or may not be accurate, this does not make any difference because the AL is only required to develop the medical record for the twelve months preceding a claimant's filing of the application for

disability. *Smith v. Commr of Soc. Sec.*, 2012 WL 6197984, *3 (11th Cir. 2012)(citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11 th Cir. 2003)). Plaintiff did not file for disability until 2012 and alleged an onset date in 2003. The ALJ does not have the duty to obtain records for medical treatment twenty years prior to the date of filing. Plaintiff ultimately bears the burden of proving her disability, and is responsible for producing evidence supporting her claim. *Ellison*, 355 F.3d at 1276. Accordingly, the Court concludes that the ALJ did not err by failing to obtain the 1987 records from Florida Medical Group.

Furthermore, Plaintiff has not shown any prejudice from the failure to obtain a consultative examination. *Brown v. Shalala*, 44 F. 3d 931, 935 (11th Cir. 1995)("In evaluating the necessity for a remand, we are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.") As discussed above, the record was sufficient for the ALJ to make an informed decision regarding Plaintiff's functional limitations. To the extent that Plaintiff argues that the ALJ needed to obtain an RFC assessment from a consultative examiner before assessing the RFC, this argument fails. Determining the RFC is within the purview of the ALJ. *See*

20 C.F.R. §§ 416.927(d)(2) (stating that while medical source opinions on

residual functional capacity are accepted, the final responsibility for that

determination is reserved for the Commissioner); 416.946(c)(stating that the

responsibility for assessing residual functional capacity is reserved for the

administrative law judge).  The failure to obtain a further consultative

examination from a psychiatrist regarding Plaintiff's RFC does not prejudice

Plaintiff because the opinion is not binding on the ALJ.  Accordingly, for

these reasons, the Court has not trouble concluding that the ALJ did not fail

to develop the record.

## B.    The ALJ properly considered the opinions of the State Agency psychologists.

Plaintiff argues that the opinions from the State agency non-

examining physicians limited Plaintiff more significantly than the RFC

determined by the ALJ.  Plaintiff says that the ALJ gave "some weight" to

these opinions but failed to explain why she ignored the more limiting

assessment that the physicians provided.

The ALJ must state, with particularity, the weight given to each

medical opinion and the reasons why she assigned that weight.  *Winschel*

*v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  As a non-

examining physician, the opinions of the state agency psychologists are

entitled to "little weight" when contrary to the opinion of an examining

physician, and by itself, the opinion of a non-examining physician does not

constitute "substantial evidence."  *Spencer ex rel. Spencer v. Heckler*, 765

F.2d 1090, 1094 (11th Cir. 1985).  An ALJ does not err, however, in

crediting the opinions of the non-examining physicians when the opinions

are consistent with the evidence in the record.  *See Forrester v. Comm'r of*

*Soc. Sec.*, 455 F. App'x 899 (11th Cir. 2012)(stating that the opinions of the

non-examining physicians were consistent with the other evidence of

record, which taken together supported a contrary conclusion to the opinion

of the treating physician).

Plaintiff argues that the ALJ failed to account for all of the functional

limitations placed on Plaintiff by the State agency psychologists in the RFC.

The ALJ, however, properly gave some weight to the opinions of the State

agency psychologists, both of whom opined that Plaintiff could be "expected

to perform simple and repetitive tasks and meet the basic mental demands

of work on a sustained basis."  (R. 511-17, 520-29.)  Consistent with these

opinions the ALJ ultimately limited Plaintiff to "simple and repetitive tasks of

unskilled work."  This limitation was consistent with the level of work that the State agency psychologists opined Plaintiff could perform.

Furthermore, Dr. McDevitt agreed with the State agency psychologists that Plaintiff could perform simple repetitive tasks that did not involve a team effort.  Thus, the ALJ's RFC assessment comports with the opinions of both State agency psychologists and with the opinion of Dr. McDevitt.

To the extent that Plaintiff argues that the State agency psychologists' assessments are more restrictive because they found that Plaintiff had the severe impairment of schizophrenia, the argument misses the point of an RFC assessment.  The RFC is based upon the functional limitations of the claimant, rather than diagnoses or impairments.  The RFC assessment by the ALJ is entirely consistent with the functional limitations suggested by the State agency psychologists and by Dr. McDevitt, all of whom agreed that Plaintiff could perform simple and repetitive tasks and had, at most, only moderate problems concentrating.  Accordingly, Plaintiff has failed to show that the ALJ "ignored" the more limiting assessments of the State agency psychologists.

Plaintiff also mentions the State agency psychologists' discussion of the "B" criteria of Listing 12.04 and 12.09 in her brief.  To the extent Plaintiff

argues that the ALJ should have found that she met either listing, this argument fails.  The State agency psychologists opined that Plaintiff only had mild to moderate difficulties in her activities of daily living, social functioning, and concentration, persistence or pace, and no episodes of decompensation.  To meet the "B" criteria of either listing, a claimant must show either two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, which Plaintiff does not exhibit.  20 C.F.R. Part 404, Subpart P, Appendix 1, 12.04(b).

If Plaintiff is arguing that the ALJ should have credited the State agency psychologists' assessment of Plaintiff's ability to concentrate, this argument is also unavailing.  The State agency psychologists assessed Plaintiff as having moderate limitations in concentration.  While Dr. McDevitt testified that there was no basis for a limitation on Plaintiff's concentration, the ALJ assessed found that Plaintiff had a moderate limitation in concentration to account for any "intermittent limitations that substance abuse might impose on the claimant's functioning, and it is consistent with the findings of the State agency psychological consultants."  (R. 16.) Consequently, the ALJ limited Plaintiff to unskilled work to account for any limitations on concentration.  As the ALJ wrote in her decision she

expressly credited the findings of the State agency psychologists and, therefore, any argument that she did not do so is incorrect.

Finally, Plaintiff refers to her living situation with her family in her "statement of issue," implying that the living situation constitutes a highly supportive living arrangement, as defined under the "paragraph C" criteria of Listings 12.04 and 12.09.  Plaintiff does not, however, provide any argument on this issue in the brief.  Nevertheless, the Court will address this issue briefly.

The ALJ expressly stated that Plaintiff had not met the paragraph C criteria under Listing 12.04 or 12.09. (R. 16.)  The paragraph C criteria requires a "medically documented history of the alleged mental disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in 'such marginal adjustment' that it is predicted that 'even a minimal increase in mental demands or change in the environment' would cause decompensation; or (3) a current history of at least one year's 'inability to function outside a

highly supportive living arrangement,' with an indication that this arrangement needs to continue.

There is no evidence that Plaintiff residing in the same home as her sister constitutes a "highly supportive living arrangement" similar to that of a hospital, halfway house, or board and care facility.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00F, "Effects of structured settings" (noting the effects of a structured setting and listing examples such as placement in a "hospital, halfway house, board and care facility, or other environment that provides similar structure.").  These settings are meant to limit the mental demands on the resident, potentially controlling the "overt symptomology" of the resident's mental disorder.  *See id.*  Although Plaintiff lives with her sister, she largely cares for herself, including tending to her personal care, preparing meals, doing laundry, driving, shopping, doing community service, and helping with the children.  Simply put, Plaintiff has not shown that her living situation provides a similar structure to that discussed in the listing.

Furthermore, even assuming that Plaintiff's residence constitutes a highly supportive living environment, Plaintiff has not shown that she would be unable to function outside of it.  The record shows that she participated

in community service with the intention of getting her driver's license after it was revoked.  Plaintiff expressed interest in vocational training to work with animals.  She was also able to shop and care for herself.

Accordingly, to the extent that Plaintiff argues that the ALJ erred by either failing to discuss Listing 12.04C or by failing to find that she met Listing 12.04C, this argument has no merit.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 12th day of May 2016.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**